IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | *  CRIM. NO. 23-CR-00064-KD |
| FRANKLIN JAVIER PEREZ-RIOS, | * |
|    *a.k.a.,* Javier Edgardo Perez-Rios, | * |
|    *a.k.a.,* Javier E. Chicas Perez, | * |
|    *a.k.a.,* Franklin J. Pineda | * |

## FACTUAL RESUME

The defendant, **FRANKLIN JAVIER PEREZ-RIOS**, admits the allegations of Counts One, Two, Four, Five, Six, Seven, Eight, Eleven, and Fifteen of the Indictment.

## ELEMENTS OF THE OFFENSE

**FRANKLIN JAVIER PEREZ-RIOS** understands that in order to prove a violation of Title 18, United States Code, Section 1343, as charged in Counts One, Two, Four, Five, Six, Seven, Eight, Eleven, and Fifteen of the Indictment, the United States must prove:

First: the Defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;

Second: the false pretenses, representations, or promises were about a material fact;

Third: the Defendant acted with the intent to defraud; and

Fourth: the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

## OFFENSE CONDUCT

Defendant, **FRANKLIN JAVIER PEREZ-RIOS**, admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for **FRANKLIN JAVIER PEREZ-RIOS's** plea of guilty. The statement of facts does not contain

1

each and every fact known to **FRANKLIN JAVIER PEREZ-RIOS** and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

## Summary of the Scheme

Pensacola resident **FRANKLIN JAVIER PEREZ-RIOS** ("**PEREZ-RIOS**") developed a fraudulent scheme where he represented himself to foreign nationals as qualified to assist them with immigration-related services, including the filing of official U.S. government forms and paperwork on their behalf to obtain legal immigration status in the United States. Specifically, **PEREZ-RIOS** claimed that he was qualified to represent individuals in immigration matters before the United States Citizenship and Immigration Services ("USCIS"), which is an agency of the United States Department of Homeland Security ("DHS"), responsible for receiving and adjudicating immigrant and non-immigrant applications and forms.

**PEREZ-RIOS** typically targeted foreign nationals from Spanish-speaking countries who were illegally present in the United States. To induce foreign nationals, **PEREZ-RIOS** portrayed himself, *inter alia*, as one or more of the following: a current government official; a former government official; an attorney; a paralegal; a legal assistant; an attorney-in-training; an immigration consultant; someone employed by USCIS; or an immigration-services professional, when in truth **PEREZ-RIOS** was none of these. **PEREZ-RIOS** profited from his scheme by charging foreign nationals substantial fees for his immigration services. The fees included payment for his work and fictitious penalties owed to USCIS such as a "pardon fee" or "forgiveness fee" for previously entering the United States illegally. **PEREZ-RIOS** promised foreign nationals that he could help them obtain permanent residence, *i.e.* a green card, in just over a year.

After being hired, **PEREZ-RIOS** assisted his clients with obtaining a temporary Florida driver's license, which is available to foreign nationals with a pending asylum claim. The issuance of

2

the temporary driver's license gave the appearance that **PEREZ-RIOS** was delivering actual results from his services. **PEREZ-RIOS** also provided his clients with fake documents on USCIS or Immigration Customs Enforcement ("ICE") letterhead stating that their immigration-related claims had been "granted" or their status had been successfully "adjusted." **PEREZ-RIOS** has not successfully helped obtain permanent legal status for anyone who hired him. Federal agents have identified at least 400 victims of **PEREZ-RIOS's** scheme.

## Background Information Related to Asylum Claims

Under certain circumstances, foreign nationals present in the United States can seek asylum to remain in this country by filing an affirmative asylum claim. To do so, the foreign national must establish certain criteria, including that they and are unwilling to return to their home country because of persecution, or a well-founded fear of persecution, based on their race, religion, nationality, membership in a particular group, or their political opinion.

An asylum claim is initiated when a Form I-589, entitled "Application for Asylum and Withholding Removal" ("asylum claim"), is filed with USCIS. USCIS is the government agency responsible for adjudicating asylum claims. The asylum claim must be filed within one year of the claimant's last arrival in the United States unless they qualify for an exception. Before an asylum claim is submitted to USCIS, it is signed by the foreign national beneficiary under penalty of perjury. Anyone assisting the foreign national with this claim must also certify that the information contained within is true and correct to the best of their knowledge.

Once USCIS receives an asylum claim, USCIS sends a Form I-797C Notice of Action ("Form I-797C") to the foreign national seeking asylum. A Form I-797C does not convey any asylum benefits. It only provides notice that USCIS has received the applicant's claim. However, the Florida Division

Rev. 9/2021

3

of Motor Services generally considers a Form I-797C as an acceptable document for the purpose of issuing a temporary Florida driver's license.

After receiving an asylum claim, USCIS schedules a biometrics appointment at the nearest USCIS facility of the claimant's address. The purpose of this appointment is to collect fingerprints and other biometric data from the asylum claimant. This required appointment is provided free of charge for asylum claimants. Next, the asylum claimant receives an interview notice, and an interview is conducted. After the interview, an asylum officer makes a determination as to the asylum claimant's eligibility, and a supervisory asylum officer reviews the decision. After the supervisory asylum officer's review, the asylum claimant receives a decision as to whether their claim has been granted or their claim is referred to an immigration court.

### The Scheme

Beginning on an unknown date, but no later than January 2017 continuing through April 2023, **PEREZ-RIOS** devised a scheme and artifice to defraud foreign nationals living in the Southern District of Alabama, Northern District of Florida, the Southern District of Mississippi, and elsewhere and elsewhere for the purpose of obtaining money from these foreign nationals by means of materially false and fraudulent pretenses, representations, and promises. To induce these foreign nationals to hire him, he actively portrayed himself as a legitimate provider of immigration-related services such as *inter alia*, as one or more of the following: a current government official; a former government official; an attorney; a paralegal; a legal assistant; an attorney-in-training; an immigration consultant; someone employed by USCIS; or an immigration-services professional to foreign nationals in need of immigration assistance.

The objective of the scheme was for **PEREZ-RIOS** to obtain money from foreign national clients under the false pretense that he was providing legitimate immigration-related services in matters before USCIS and obtaining immigration-related benefits from USCIS on the foreign nationals' behalf. These foreign nationals hired **PEREZ-RIOS** with the expectation that he would represent them in immigration-related matters before USCIS and help them legally obtain some form of legal status in the United States, including permanent resident status. **PEREZ-RIOS's** clients paid him via cash, money orders, checks, and through digital payment services such as CashApp and Zelle.

After being hired, **PEREZ-RIOS** met with clients to obtain their personal identifying information. The meetings frequently occurred at properties owned, rented, or controlled by **PEREZ-RIOS** in Pensacola, Florida. **PEREZ-RIOS** also obtained clients' personal identifying information through phone communications. After obtaining this information, **PEREZ-RIOS** completed asylum applications and filed asylum claims with USCIS on behalf of his clients. In some instances, clients did not want to seek asylum and were unaware that **PEREZ-RIOS had** filed an asylum claim with USCIS on their behalf. In other instances, clients were aware that an asylum claim would be filed, but were not informed of the potential legal, administrative, and immigration-related consequences of filing such a claim. In other instances, clients hired **PEREZ-RIOS** to file applications and petitions with USCIS, however, **PEREZ-RIOS** never filed anything on their behalf.

For those whom **PEREZ-RIOS** filed asylum claims, **PEREZ-RIOS** prepared the asylum claims on their behalf. **PEREZ-RIOS** knew the asylum claims he prepared contained materially false statements about his clients. Some asylum claims contained forged signatures of his clients. USCIS's Fraud Detection and National Security (FDNS) officers reviewed asylum claims filed by **PEREZ-RIOS** on behalf of his clients. The content of the applications contained inaccurate dates of entry and recycled templates of narratives not unique to the individual claimant. Many victims confirmed

5

in their interviews with HSI agents that they had not seen the application prepared by **PEREZ-RIOS,** did not recognize the signatures, and that the information contained in the application was inaccurate.

**PEREZ-RIOS** used a mailing address associated with one of his properties on the asylum claims, rather than the client's actual address. This ensured that **PEREZ-RIOS**, not the client, received any correspondence from USCIS about the pending claim. Therefore, clients depended solely on **PEREZ-RIOS** to provide any information related to their immigration cases. **PEREZ-RIOS** regularly communicated with his clients via phone communications and text messages as well as internet-based application services such as iMessage, WhatsApp, and Facebook Messenger. Using these facilities of communication, **PEREZ-RIOS** collected information from the clients, provided updates, and gave directions to them to follow related to their immigration cases. For example, **PEREZ-RIOS** informed clients about purported requirements of the immigration process, provided itineraries for trips California and Louisiana, and requested payment for his services.

Once **PEREZ-RIOS** filed an asylum claim on behalf of a client, he received a Form I-797C from USCIS confirming receipt of the claim at his address. **PEREZ-RIOS** used these Form I-797C's to help his clients obtain temporary Florida drivers licenses. Although neither the receipt of a Form I-797C or a Florida driver's license meant that the client would necessarily receive legal status in the United States, **PEREZ-RIOS** falsely led clients to believe that these events indicated he was successfully handling their claims.

Throughout the scheme, **PEREZ-RIOS** collected various "fees" from the clients. In addition to payments for **PEREZ-RIOS's** services, he told his clients these "fees" were required by the United States government. However, these "fees" were fictitious, and **PEREZ-RIOS** simply took his clients' money under fraudulent pretenses. During and in furtherance of this scheme, **PEREZ-RIOS** told

clients that if they did not pay the "fees", he would cancel a client's asylum claim and they would be subject to deportation. Examples of such fictious "fees" include, but are not limited to the following:

1) **PEREZ-RIOS** collected "fees" from his clients to be paid to USCIS as a "forgiveness fee" or "pardon fee" for entering the United States illegally. There is no "forgiveness fee" or "pardon fee" charged to asylum claimants.

2) **PEREZ-RIOS** collected "fees" for filing an asylum claim. There is no filing fee for an asylum claim.

3) **PEREZ-RIOS** collected "fees" from his clients that would supposedly be paid to USCIS for the clients' biometrics information collection in New Orleans, Louisiana. These services are automatically scheduled upon filing an asylum claim and provided to claimants free of charge.

4) **PEREZ-RIOS** collected "fees" for obtaining a temporary Florida Driver's License for his clients as explained above. USCIS does not charge a fee to claimants to obtain a temporary state driver's license.

5) **PEREZ-RIOS** collected "fees" related to trips to California under the auspices that the trip was a necessary part of the asylum process or otherwise obtaining legal status. USCIS does not require a cross-country trip to California as part of an asylum claim.

6) **PEREZ-RIOS** collected "fees" for medical examinations and vaccinations performed in California. There is no medical examination or vaccination requirement to obtain asylee status.

**PEREZ-RIOS**'s scheme was convincing to a vulnerable Spanish-speaking population unfamiliar with immigration procedures because it had the appearance of progress and results. To make his immigration services appear legitimate, **PEREZ-RIOS** created, distributed, and caused to be distributed to his clients forged letters, receipts, and documents that appeared to bear official government seals, including the seals for USCIS and United States Immigration and Customs Enforcement ("ICE"). These fraudulent documents included references to fake case numbers and fake authorizing entities such as the "Departmentz of Homeland Security," "United States of North America," and "United North America."

Rev. 9/2021

**PEREZ-RIOS** falsely told his clients that they were required to travel with him to a USCIS office near the United States/Mexican border in San Ysidro, California as part of the immigration process. In addition to the fees charged by **PEREZ-RIOS** for his "work" on the trip, clients paid for their travel and lodging. There is no legitimate reason for individuals to travel across the United States to a distant port of entry as part of a legitimate asylum claim. While in California, **PEREZ-RIOS** told his clients to wait outside an USCIS building while he went inside. **PEREZ-RIOS** returned to the clients with false updates about their status and would typically present the fraudulent paperwork providing that their asylum claim had been granted or that their status had been adjusted. Moreover, during the trip to California, **PEREZ-RIOS** arranged for his clients to receive medical examinations and vaccinations. There is no vaccination or medical examination required as part of the asylum claim process. The California trips were just a façade and opportunity to charge clients for what they believed were legitimate steps in the immigration process.

When **PEREZ-RIOS** did not deliver on his promises for immigration benefits within certain time periods, he made materially false and fraudulent misrepresentations to his clients about errors and delays at USCIS to justify and conceal a lack of action and progress of their applications. When clients demanded refunds, **PEREZ-RIOS** provided a litany of excuses, including that he was in poor health and had left Florida to receive chemotherapy treatment for cancer. When pressed for updates, **PEREZ-RIOS** referred his clients to his fictitious USCIS "boss" named Officer Carlos Daniel Corrales to advise them about their pending cases. **PEREZ-RIOS** explained that his "boss" could only communicate through his email address of "officialcorralesgov@hotmail.com." When clients communicated with the email account, "Officer Corrales" explained that **PEREZ-RIOS** was being treated for cancer and that his chances of recovering were minimal. "Officer Corrales" also praised **PEREZ-RIOS** for making application processes work "seamlessly." **PEREZ-RIOS** also included

8

references to "Official Supervisor First Andress Corrales" on some of the fraudulent documents on USCIS letterhead that he provided to his clients.

### Victim Interviews

Federal agents interviewed dozens of victims who hired **PEREZ-RIOS** for immigration assistance. One victim, J.M.V., a 29-year-old citizen of Mexico, came to the United States when he was 8 years old. J.M.V, a Mobile County, Alabama resident, was referred to **PEREZ-RIOS** by a friend to help him with an expired work authorization permit. Around August 2021, J.M.V. met with **PEREZ-RIOS**, who represented himself as an attorney employed by the United States government. **PEREZ-RIOS** promised J.M.V. that he could help him obtain a green card within 2 years. **PEREZ-RIOS** told J.M.V. that he was taking a group of people to California in a week and J.M.V. would need to decide quickly whether he wanted to begin the immigration process. J.M.V. agreed to hire **PEREZ-RIOS** and travelled to California the next week. In California, J.M.V. was taken with a group of 15-20 other clients to a medical clinic for a medical exam and vaccinations. J.M.V. went on a second trip a few months later to California because **PEREZ-RIOS** said it was necessary to sign immigration papers. In addition to paying for the trips to California, J.M.V. paid **PEREZ-RIOS** approximately $5,000 to $6,000 for his services. J.M.V. paid **PEREZ-RIOS** in cash, money orders, and through CashApp and communicated with **PEREZ-RIOS** primarily by WhatsApp, phone calls, and text message. J.M.V. explained that if clients became difficult or not paying, **PEREZ-RIOS** would portray that he was speaking on the phone with his "immigration co-worker" about cancelling a client's immigration process. J.M.V. never received any immigration benefit from **PEREZ-RIOS** and stopped communicating with him after federal agents conducted a search warrant at **PEREZ-RIOS's** residence.

O.H.G., a 29-year-old citizen of Honduras, came to the United States when he was 14 years old. O.H.G., a Baldwin County, Alabama resident was referred to **PEREZ-RIOS** by a friend to help with adjusting his immigration status. Around August 2019, O.H.G. met **PEREZ-RIOS**, who represented himself as a paralegal for the "Tallahassee Office of Immigration." **PEREZ-RIOS** informed O.H.G. to apply for asylum because people who were currently in the United States claiming asylum could not be denied. O.H.G. paid **PEREZ-RIOS** around $3,500 to $4,000 using money orders for the asylum application. **PEREZ-RIOS** never filed an asylum application on behalf of O.H.G. **PEREZ-RIOS** promised O.H.G. that he could obtain a driver's license, work permit, and permanent resident status. O.H.G. also paid **PEREZ-RIOS** $1,000 to help with his wife's immigration status. O.H.G. travelled to California with a group as instructed by **PEREZ-RIOS**. While in California, PEREZ-RIOS told the group that he had to take immigration applications inside the immigration office. During the trip, O.H.G. saw **PEREZ-RIOS** give other clients in the group envelopes containing what he believed were immigration documents. O.H.G. nor his wife received any immigration benefit promised by **PEREZ-RIOS**.

O.B.S., a 33-year-old Mexican citizen, came to the United States when he was 15 years old. Around October 2018, a family member recommended **PEREZ-RIOS** to help with immigration services. O.B.S., a Baldwin County, Alabama resident, met **PEREZ-RIOS**, who represented himself as a paralegal, who worked for an immigration attorney. **PEREZ-RIOS** told O.B.S. that he would be eligible for asylum in the United States and guaranteed that he could obtain a green card one year and one day after initiating the immigration process. O.B.S. never saw the asylum claim that **PEREZ-RIOS** filed on his behalf. **PEREZ-RIOS** helped O.B.S. obtain a temporary Florida driver's license. O.B.S. visited **PEREZ-RIOS** at his residence in Pensacola where he saw a large amount of files. **PEREZ-RIOS** told O.B.S. that he had helped over 200 people obtain legal status in the United States.

O.B.S. travelled twice to California with groups of people as arranged by **PEREZ-RIOS**. During one trip, **PEREZ-RIOS** took the group to the port of entry and went inside an office for over an hour. **PEREZ-RIOS** returned to the group with a letter on ICE letterhead stating that O.B.S.'s asylum claim had been approved. O.B.S. primarily communicated with **PEREZ-RIOS** about his immigration case by text message, voice calls, and Facebook Messenger. Other than being fingerprinted by USCIS in New Orleans, O.B.S. had no contact with USCIS while dealing with **PEREZ-RIOS**. O.B.S. initially paid **PEREZ-RIOS** with money orders payable to "immigration," however, PEREZ-RIOS instructed him that "immigration" preferred the money orders to be blank.

I.L.L., I.S.G., I.B.C., J.S.B., and J.G.J. all reported similar versions of their dealings with **PEREZ-RIOS** when interviewed by federal agents. All these victims explained that they would not have hired, nor paid, **PEREZ-RIOS** had they known that **PEREZ-RIOS** was not a legitimate provider of immigration services. They confirmed that **PEREZ-RIOS** did not provide the immigration services for which he was hired and paid. In many cases, these asylum claims filed by **PEREZ-RIOS**, or lack thereof caused collateral harm to the foreign nationals. For instance, **PEREZ-RIOS** did not inform clients of scheduled asylum interviews or falsely advised clients that asylum interviews were not required.

### Wire Communications

During and furtherance of this scheme, **PEREZ-RIOS** caused several wire communications to be transmitted in interstate commerce, including the following certain wire communications identified in Counts One, Two, Four, Five, Six, Seven, Eight, Eleven, and Fifteen of the Indictment:

| Counts | Date | Client | Description |
| --- | --- | --- | --- |
| 1 | 07/15/2018 | JCME | A phone call from **PEREZ-RIOS** to JCME explaining that **PEREZ-RIOS** had received a call from an immigration officer concerning JCME's wife. |
|  |  |  |  |

11

| 2 | 10/19/2018 | OBS | Transaction for a Western Union money order purchased in the amount of $210.00. |
|---|---|---|---|
| 4 | 10/28/2019 | ILL | iMessage from **PEREZ-RIOS** to ILL advising that **PEREZ-RIOS** had sent his USCIS application |
| 5 | 11/25/2018 | ISG | Phone call from ISG to **PEREZ-RIOS** in which **PEREZ-RIOS** advised that ISG must go to California for an adjustment of status and residency |
| 6 | 05/14/2019 | IBC | Transaction for a MoneyGram money order purchased in the amount of $475.00 |
| 7 | 06/10/2019 | OHG | Transaction for a MoneyGram money order purchased in the amount of $475.00 |
| 8 | 06/24/2019 | JSB | Phone call from **PEREZ-RIOS** to JSB in which **PEREZ-RIOS** provided information related to an immigration matter. |
| 11 | 11/04/2019 | JGJ | WhatsApp message from **PEREZ-RIOS** to JGJ advising JGJ to come to his residence in Pensacola, Florida as a client |
| 15 | 02/04/2022 | JMV and other members of the group message | A WhatsApp message from **PEREZ-RIOS** to JMV and members of a group message titled "GRUPO RESIDENCIA Y PERMIS" which translates to "GROUP RESIDENCE AND PERMIT" advising the group that he had spoken to his boss and worked out an option to obtain the work authorizations without traveling to USCIS in Texas. |

All the above-mentioned wire communications transmissions in interstate either began or ended in the Southern District of Alabama. Specifically, as to Counts 1, 5, and 8, **PEREZ-RIOS** caused interstate communications via phone calls with the victims identified above to help carry out his scheme to defraud. At the time that the victims communicated with **PEREZ-RIOS** via an interstate phone call, the victims were in Baldwin County, Alabama in the Southern District of

Alabama and **PEREZ-RIOS** was outside the state of Alabama. The subject of the phone calls was to provide information related to the so-called progress of the victims' immigration cases.

As to Count 2, O.B.S. purchased a Western Union money order in Baldwin County, Alabama at the direction of **PEREZ-RIOS** for payment of his services. At the time the Western Union money order was purchased, an interstate communication noting the details of the purchase was routed to servers controlled by Western Union outside the state of Alabama. As to Counts 6 and 7, I.B.C. and O.H.G. purchased MoneyGram money orders in Baldwin County, Alabama at the direction of **PEREZ-RIOS** for payment of his services. At the time the MoneyGram money orders were purchased, an interstate communication noting the details of the purchases were routed to servers controlled by MoneyGram outside the state of Alabama.

As to Count 4, I.L.L. received an iMessage from **PEREZ-RIOS** in furtherance of the scheme. I.L.L. was in Baldwin County, Alabama when he received the message. As to Counts 11 and 15, J.G.J. and J.M.V. received WhatsApp messages from **PEREZ-RIOS** while J.G.J. was in Baldwin County, Alabama and J.M.V. was in Mobile County, Alabama. The iMessage and WhatsApp messages are routed through servers outside the state of Alabama via internet connections. The subject of the messages was **PEREZ-RIOS** providing updates and directions for what they believed were legitimate immigration services at the time.

### Search Warrants and Interview

On April 26, 2022, HSI agents executed a search warrant at **PEREZ-RIOS's** primary residence in Pensacola. At the residence, HSI agents found files for hundreds of victims of the fraud scheme. HSI agents also found money orders, counterfeit USICS documents, passports, passport copies, and official USCIS documentation displaying hundreds of victims' names and personal identifying information. HSI agents also examined electronic devices and Hotmail email

13

accounts belonging to **PEREZ-RIOS**. Agents found several draft templates of the fraudulent documentation on USCIS and ICE letterhead, which **PEREZ-RIOS** routinely issued to his clients.

On the same day of the searches, **PEREZ-RIOS** was given *Miranda* warnings and agreed to a voluntary interview by HSI Special Agent Mark Phillips, HSI Special Agent Laura Andersen, HSI Task Force Officer Edward Vincent, Border Patrol Agent Daniel Roland, and Customs and Border Protection Officer TFO Juan Gastaliturri. **PEREZ-RIOS** admitted that he never worked for the U.S. Government and confirmed that he is not an attorney or paralegal. **PEREZ-RIOS** claimed that he did not run an immigration-services business. Instead, he characterized his role as helping people with immigration. **PEREZ-RIOS** said that he had been conducting his immigration service in Pensacola for foreign nationals for about 3 years. **PEREZ-RIOS** admitted that he charges people for his services. **PEREZ-RIOS** claimed that he makes approximately $14,000 per year assisting people with immigration and did not believe that this amount met the reporting threshold for tax purposes. **PEREZ-RIOS** admitted that he took people to California but said only for people who had been detained in California and are required to return for a court hearing.

None of the victims were brought to any court hearing in California during **PEREZ-RIOS's** orchestrated trips. Moreover, federal agents reviewed several bank accounts belonging to **PEREZ-RIOS,** as well as money orders and digital payment service records such as Zelle and CashApp used by **PEREZ-RIOS** during its investigation into his scheme. An HSI financial auditor conducted a financial analysis of all deposits stemming from the fraud scheme, which included deposits of cash, money orders, Zelle transfers, wire transfers, checks, and electronic funds transfers into **PEREZ-RIOS's** bank accounts. HSI agents determined through the financial analysis that, between 2017 and 2023, **PEREZ-RIOS** profited $2,805,136.92 in illegal proceeds from his scheme to defraud foreign nationals seeking immigration assistance. **PEREZ-RIOS** did not have any other

legitimate source of employment income that would account for this amount of income during this same time frame.

## LOSS AMOUNT

Between 2017 and 2023, the intended and actual loss in this case totals between $2,000,000.00 but no more than $3,500,00.00, which represents the amount of illegal proceeds obtained from the wire fraud scheme perpetrated by **PEREZ-RIOS** in the Southern District of Alabama, Northern District of Florida, and elsewhere.

AGREED TO AND SIGNED.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY

Date: August 8, 2023

JUSTIN KOPF
Digitally signed by JUSTIN KOPF
Date: 2023.08.08 16:39:46 -05'00'

Justin D. Kopf
Assistant United States Attorney

Date: August 8, 2023

/s/ Kacey Chappelear
Kacey Chappelear
Assistant United States Attorney
Deputy Chief, Criminal Division

Date: 8-24-23

Franklin Javier Perez-Rios
Defendant

Date: 8-24-23

Thomas E. Dasinger
Attorney for Defendant

15